UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JANICE MAE BULLOCK                    CIVIL ACTION

VERSUS                                       NO. 11-1495

MICHAEL J. ASTRUE, COMMISSIONER         SECTION "C" (2)
OF SOCIAL SECURITY ADMINISTRATION

**ORDER ON MOTION;**
**FINDINGS AND RECOMMENDATION**

Plaintiff, Janice Mae Bullock, seeks judicial review pursuant to Section 405(g) of

the Social Security Act (the "Act") of the final decision of the Commissioner of the

Social Security Administration (the "Commissioner"), denying plaintiff's claim for

supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§

405(g), 1381a. This matter was referred to a United States Magistrate Judge pursuant to

28 U.S.C. § 636(b) and Local Rule 73.2(B).

Instead of filing a memorandum of facts and law as ordered, Record Doc. No. 15,

Bullock filed a Motion for Sentence Six in Lieu of Summary Judgment, which includes

a request to supplement the administrative record with allegedly new and material

evidence that is attached to the motion. Record Doc. No. 18. As ordered, Record Doc.

No. 20, the Commissioner filed a reply memorandum that contains his opposition to

plaintiff's motion to submit new evidence. Record Doc. No. 21. Although defendant

filed his memorandum one day after the filing deadline without seeking leave to do so, the court has considered his submission.

Having considered the submissions of the parties and the applicable law, and for the following reasons, IT IS ORDERED that plaintiff's motion to supplement the record with new evidence is DENIED.  IT IS RECOMMENDED that plaintiff's Motion for Sentence Six in Lieu of Summary Judgment be DENIED and her complaint be DISMISSED WITH PREJUDICE.

I.      PROCEDURAL HISTORY

Bullock filed an application for SSI on April 1, 2009, alleging disability since September 30, 2008, due to "lung cancer, back, r[igh]t leg, l[ef]t foot, memory, seizures [and] ulcers."  (Tr. 105, 117).  After her application was denied on August 17, 2009 (Tr. 58-59), she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 10, 2010.  (Tr. 22-57).  On April 23, 2010, the ALJ issued a decision denying plaintiff's application.  (Tr. 6-18).  After the Appeals Council denied review on April 19, 2011, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-4).

II.  STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.  The ALJ erred in failing to take into account the side effects and limitations of plaintiff's medications and the frequency of her scheduled visits to her doctors and unscheduled visits to hospital emergency rooms.

B.  The ALJ erred in failing to adopt the hypothetical questions posed to the vocational expert by plaintiff's attorney.

Bullock also seeks leave to submit allegedly new and material evidence, which she has attached to her memorandum. Based on that evidence in combination with the entire record, she asks the court to find either that she is disabled or that the new evidence warrants a remand to the Commissioner for additional findings of fact.

III.  ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.  Bullock has severe impairments consisting of chronic obstructive pulmonary disease and degenerative disc disease of the lumbar spine.

2.  She has the residual functional capacity to perform light work as defined by 20 C.F.R. § 416.967(b), except that she must avoid all exposure to fumes, odors, dusts, gases and poor ventilation and concentrated exposure to extreme cold and heat, wetness and humidity.

3.  Although Bullock's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are inconsistent with her lack of effort to receive treatment and are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

4.      Plaintiff is capable of performing her past relevant work as a cashier and a companion/sitter.

5.      Alternatively, considering her age, education, work experience and residual functional capacity, Bullock is capable of performing other jobs that exist in significant numbers in the national economy, such as cashier, information clerk, general office clerk and hand packer.

6.      The hypothetical questions posed by plaintiff's counsel were not expressed in vocational terms, did not provide clear or specific functional limitations, and were not supported in the record.

7.      Plaintiff has not been under a disability since April 1, 2009, the date her application for SSI was filed.

(Tr. 11-17).

IV.     ANALYSIS

A.      Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971);

<u>Perez</u>, 415 F.3d at 461; <u>Loza</u>, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Id.</u>

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  <u>Perez</u>, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  <u>Id.</u>; <u>Newton</u>, 209 F.3d at 452; <u>Martinez v. Chater</u>, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2010).  The regulations

include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is

---

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez, 64 F.3d at 174.

B.     Factual Background

Bullock testified that she could not remember the last time she had worked.  She said she tries to clean and do some yard work, but she fell because her legs are weak. She said that she used to milk cows all her life, but she stopped because of her back.  (Tr. 25-26).  She testified that she finished the eighth grade in special education classes, but could not remember things that she read at school and could not learn anything despite having had tutors.  She stated that she cannot read and has learned things on her own and from her sisters.  (Tr. 26).

Plaintiff said that she takes pain medication, but it does not work and only helps a little bit.  She testified that her doctors have tried her on different medications, most recently on Demerol[2] from North Oaks Hospital, but that she cannot function on

_____

[2]Demerol (generic name: meperidine) is a narcotic pain medication used for the relief of mild to moderate pain.  PDRHealth (PDR Network, LLC 2011), http://www.pdrhealth.com/drugs/demerol.

Demerol. She stated that she does not like taking medication because she used to be on drugs, but has "fought the devil so long and I finally got him out of my life and I don't want to take [any] medication." She said that she "want[s] to get to the surgeons if they'll help me." (Tr. 27-28).

Bullock stated that her husband of thirteen years beat her and "put me in the hospital three or four times," and that he had just recently died. (Tr. 28). She said that he would not give her a divorce. She testified that she survives with food stamps and help from church and friends, who have given her a place to live.

Plaintiff stated that she ended up in the hospital every time that she tried to work. She said she still tries to work, but cannot even put her clothes on by herself. She said that her niece and her sisters do some housework for her and that her adult son takes care of her yard and cleans her house once a week. (Tr. 29).

Bullock testified that she was "in major pain" while sitting at the hearing. She stated that she cannot breathe if she lies down, so she sleeps sitting up on a couch with four pillows behind her back, but that it makes her body hurt worse. She said she has not had a good night's sleep in three years. She testified that her doctors have recommended surgery on her back. She stated that her treating physician, Dr. Genovese, told her about two years ago that she has lung cancer. (Tr. 30). She said Dr. Campbell at Lallie Kemp

Hospital diagnosed her with emphysema and chronic obstructive pulmonary disease when she was exposed to tuberculosis.

Bullock stated that she had applied for disability benefits before Hurricane Katrina and was told that her records were lost when the veterans' building was hit by the hurricane. She said that her prior application was denied a year or two after Hurricane Katrina and that she appealed it, but never heard anything about the appeal. (Tr. 31-32).

Plaintiff testified that she has been taking Paxil for depression and that it helps and does not knock her out. She said the medication does not help her control her temper, and that being unable to control her temper and hurting people has been a problem for her all her life. She stated that she has trouble sleeping because of pain, breathing problems and "crazy" dreams. (Tr. 32). She said she wakes up and cannot go back to sleep when she has such dreams.

Bullock stated that she has sudden migraine headaches. She testified that recently she has had bad headaches two to three times per day and that the "strike pain" makes her vomit. She said she has been having diarrhea during the past three months. She stated that she does not know the reason, but it cannot be from her "nerves" as "a lot of people" have suggested, because she does not take any nerve medication. She testified that, when she coughs, she has urinary incontinence and that this problem has been going on for about a year. (Tr. 33-34).

Plaintiff stated that Dr. Genovese had recommended that she quit smoking and she has done so. She said that she takes Spiriva once a day and Advair twice a day and uses a Proair inhaler three to four times a day when she needs it for her breathing problems, and that she takes "breathing treatments." She stated that the weather affects her and that the rain and cold are "killing me right now." She testified that the cold weather makes her ache from her head to her toes, and that she also hurts in the sunshine, but less. (Tr. 34-35).

Bullock testified that the light hurts her head when she has a migraine, so that she has to close her eyes and put a hot rag on her head to try to relieve the pain. She thought the migraines might have been caused by a car accident in 20 years ago, when the car in which she was riding blew a tire and flipped over 15 times. She stated that she was thrown 100 yards from the car and was pronounced dead at the scene, but her sister performed CPR and revived her. (Tr. 35). Plaintiff explained that she thought the accident might have caused her migraines because the right side of her face was crushed, she was blind and she did not have any treatment. She said that, when she was discharged from the hospital, she did not know what had happened, where she was or even that she had a child. She testified that she was able to work after the accident because she was strong and a tomboy.

Plaintiff said she cannot bend down and pick up an object from the floor unless she sits down and reaches for it. However, she stated that she might fall while trying to get up because she has fallen several times. She testified that she lost her balance and fell off her doorstep a couple of months ago while trying to lock her door. She said her son has now built a railing next to the door for her to hold, but she no longer tries to lock that particular lock on her door. (Tr. 36-37).

Bullock testified that she went to the emergency room after she pushed a lawn mower with her stomach, which she had tried to do "slow and easy." She said that her back locked up and she could not stand or straighten up after she finished mowing the lawn and sat down to rest. She stated that, every time she tried to straighten up, the pain was so bad that it made her vomit. She said that a friend happened to come by and took her to the hospital. She said that she cannot call 911 anymore because the ambulance costs too much. Plaintiff stated that she would sit there and "take that pain until it kills me . . . unless somebody comes by." (Tr. 37). Then she said that she had called a friend, Jerry Pierre, and that he came and took her to North Oaks Hospital twice within the last two or three days. (Tr. 37-38).

Plaintiff testified that she went to Lallie Kemp Hospital the last time for her neck, shoulder and elbow, and that a woman at the hospital told her that she had gout. Bullock did not believe it because she never heard of anyone having gout in an elbow. She said

that the woman asked her what she wanted for the pain and whether she wanted more "Lartels,"[3] but Bullock asked for "Tramodone"[4] because it was non-narcotic. Plaintiff said that the "Tramodone" worked a little bit. She speculated that she had become immune to some drugs. (Tr. 38). She stated that she takes an Excedrin about three hours later if the prescription drug does not work, and that Excedrin "burns my gut like crazy, but it does kind of help ease the pain some." (Tr. 38-39). She said she also has acid reflux disease, which causes "burning all the time" in her throat and chest, so that she cannot eat much of anything and she vomits if she does eat.

Bullock testified that she had tried to work at a chicken restaurant in Kentwood, Louisiana. She said she was only supposed to cook, but then the restaurant required her to lift heavy equipment, which she could not do. (Tr. 39-40). She stated that standing on the concrete floor also hurt her back and that one of her doctors told her that standing on concrete would cause her arthritis to act up. She said that being on the concrete floors at the hearing had made her hurt more than when she arrived at the hearing. (Tr. 40).

---

[3]This probably should be Lortab, which plaintiff has taken at times, according to her medical records. Lortab is a combination of hydrocodone, a narcotic (opioid) analgesic, and acetaminophen, a non-opiate analgesic, and is indicated for the relief of moderate to severe pain. Drugs.com (Feb. 2, 2012), http://www.drugs.com/lortab.html.

[4]This probably should be tramadol. Tramadol hydrochloride is a centrally acting, synthetic opioid analgesic that "is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." Physicians' Desk Reference 2519, 2520 (66th ed. 2012).

When questioned about a possible diagnosis of lung cancer, plaintiff's attorney was unable to locate any such diagnosis in the medical records. Bullock stated that she was not being treated for lung cancer because she was not going to let it kill her and she would not be treated with any chemotherapy or radiation. She said that, if she wants to die, she would "blow my brains out" with a shotgun. (Tr. 41-42).

Plaintiff testified that she stopped smoking four months earlier and stopped using drugs and alcohol eight years ago. She said she had never been in prison. She stated that she had been convicted of assault but was also proven innocent in Mississippi. (Tr. 42-43). She testified that she quit drugs on her own without any need for rehab or other treatment and that other people could do it, too, if they really wanted to quit.

Bullock said she did not own anything except a few clothes. She stated that she receives $200 in food stamps per month and that her niece went to the grocery store and bought her what she needed when she received her food stamps. (Tr. 43). She said she lives alone in a small house that was given to her rent-free until she could get Social Security benefits or some other help.

Bullock said that she used to have hobbies, but cannot do anything anymore. She testified that she used to help old people, work in the yard, mow grass, grow flowers, milk cows, fish, hunt and do mechanical and carpentry work. (Tr. 44-45). She stated that she is able to cook for herself as long as she can hang on to something. She said she has

set up the house so that she can hold on to chairs and other things and catch herself if she starts to fall. She testified that her arm has weakened because she has not been doing anything to work it out. She said that walking with the cane she had at the hearing and trying to hold on was making her arm hurt worse. She testified that she only goes to stores that provide a wheelchair because she cannot walk around a store. (Tr. 45-46).

Plaintiff stated that she worked as both a milker for a dairy and a sitter for the elderly within the past 15 years. She said she had stopped working as a sitter after a sink fell on her foot and "everything got [worse]." (Tr. 47-48). She testified that she cannot read. (Tr. 53).

### C.   Vocational Expert Testimony

Regarding plaintiff's past relevant jobs, a vocational expert, Kasey Suggs, testified that a milker was unskilled work at a medium exertional level. She stated that the job of fast food worker is unskilled, light work. She said that the jobs of cashier and companion or elderly sitter are both light and semi-skilled jobs. (Tr. 48).

Bullock's attorney posed a hypothetical to Suggs of a person who cannot breathe freely, has pain or problems in her back, leg, knees and foot that cause a change in her gait, cannot sleep because of emphysema or other problems with breathing caused by smoking too much over the years, and has exacerbation of back pain upon any exertion or use of force that causes her to go to the hospital for pain medication, is depressed,

takes Paxil for depression and has migraine headaches that require her to cover her eyes and lie down or sit up. (Tr. 48-49). When asked whether such a person could perform any substantial gainful employment, Suggs stated that she could not answer because she is not a medical expert and cannot give a medical opinion. She said that the hypothetical question would have to be quantified and clarified, in terms of frequency and duration in a work day, so that she would know how the enumerated medical problems affect the person's ability to work. (Tr. 49-50).

Plaintiff's attorney then tried to ask Suggs whether the hypothetical person could work if she (1) had unscheduled headaches three times a day or four times a month that required her to be away from her work station and be taken either to a nurse's station or to her home, (2) had unspecified "negative effects" from pain medication and (3) was unable to sit or stand for very long because of back pain. (Tr. 50-51). Suggs again asked plaintiff's counsel to clarify and quantify his questions. The ALJ told the attorney that he would have to tell the vocational expert how many minutes or hours the person can do each functional capacity of work. (Tr. 51). The attorney then added more limitations to the hypothetical, so that the person could not stand for more than an hour without needing to sit to ease the back pain and would have to avoid any kind of cold or damp weather. The vocational expert did not answer these questions.

The ALJ then gave plaintiff's attorney time to formulate a different question while the ALJ himself posed a hypothetical of a person with the same age, education and work experience as Bullock who can perform work at the sedentary level, except she cannot climb stairs or ramps, and other postural abilities are limited to occasional. In addition, the hypothetical person should avoid concentrated exposure to extremes of cold, heat, wetness and humidity; avoid all exposure to fumes, odors, dusts, gases and poor ventilation; and avoid hazardous machinery and high, unprotected places. (Tr. 52-53). Suggs testified that such a person would not be able to perform any of plaintiff's past relevant work but would be able to perform the jobs of cashier, information clerk, general office clerks and hand packers, of which there are significant numbers in the Louisiana and national economy. (Tr. 53).

Plaintiff's attorney then modified the hypothetical so that the "individual would have a great deal of difficulty in sitting and/or standing a very, in other words would have to change positions and then would be unable to even then bend down without negative results and her back may lock up and she'd have to be taken to the hospital, would that be a limitation with negatively suggested employment from the judge's hypothetical?" (Tr. 53-54). Upon the vocational expert's request, the attorney clarified that the person would have to alternate positions by sitting for a little while, then standing for a little while. Suggs testified that the sedentary jobs she had identified would allow the person

to stand up for a little while and then sit down.  She stated that a limitation of no bending would not impact any of these jobs.  She asked the attorney to quantify how often the person would have to be taken away from her work setting to go to the emergency room. Plaintiff's attorney said that the medical records indicate that Bullock had gone to the emergency room with back pain twice in the past week and had gone at least once or twice a month before that.  (Tr. 54-55).  Suggs testified that a person who is away from her work environment and unable to work two times per week would not be able to maintain the jobs that Suggs had named, or any jobs.  The vocational expert stated that a hypothetical person who had to be treated in the emergency room away from her work station more than three times per month would not be able to maintain any employment because employers do not tolerate missed work more than three to four times per month. (Tr. 55).  Suggs testified that a person who, more than once or twice, missed work three times in a month would be subject to termination.  (Tr. 56).

### D.   Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 13-15).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.      Plaintiff's Appeal

1.      Plaintiff's motion to submit new evidence is denied.

Bullock attached to her memorandum two identical copies of a single page that appears to be the last page of a multi-page report dated June 10, 2011.  She says in her memorandum that this is a magnetic resonance imaging (MRI) test result, but the incomplete report itself does not say what type of test was performed.  According to this incomplete exhibit, which is signed by Paul M. Jackson, M.D., the test revealed (1) a severe disk bulge at L4-L5 with broad-based disk protrusion, moderate spinal canal narrowing and impingement of the descending L5 nerve roots on the left greater than the right; and (2) a moderate to severe disk bulge at L5-S1 with a shallow central/right paracentral disk protrusion that contacts the descending L5 nerve root, and asymmetric disk bulging to the right that results in right-sided, mild foraminal narrowing and contact of the exiting right L5 nerve root.  Plaintiff's Attachment I, Record Doc. No. 18-3 at p. 1.[5]  Bullock argues that this medical record supports her argument that she was disabled during the relevant time period.

_____

[5]The other attachments to plaintiff's memorandum are (a) portions of the administrative record, Plaintiff's Attachment II, Record Doc. No. 18-3 at pp. 3-10, which are unnecessary because they are already in the record, and (b) an order of the Appeals Council dated December 21, 1990, concerning a different Social Security claimant.  Plaintiff's Attachment III, Record Doc. No. 18-3, at pp. 11-13.  This document is completely irrelevant to the instant case.  Plaintiff's counsel is cautioned that he should never include the complete Social Security numbers of third parties in any filing in this court, Fed. R. Civ. P. 5.2(a)(1), even when, as here, the document is restricted from public viewing.

It is well established that this court may <u>not</u> issue factual findings on new medical evidence and may review such evidence only to determine if a remand to the Commissioner is appropriate. <u>Martinez v. Astrue</u>, 252 F. App'x 585, 587 (5th Cir. 2007) (citing 42 U.S.C.A. § 405(g); <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1471 (5th Cir. 1989)); <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995). Accordingly, I must determine whether this case should be remanded so that the Commissioner may consider the allegedly new and material evidence.

The court may remand for consideration of new evidence only upon a showing that the evidence is new <u>and</u> material, <u>and</u> that good cause exists for plaintiff's failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); <u>Joubert v. Astrue</u>, 287 F. App'x 380, 383 (5th Cir. 2008) (citing <u>Ripley</u>, 67 F.3d at 555); <u>Garson v. Barnhart</u>, 162 F. App'x 301, 303 (5th Cir. 2006) (citing <u>Leggett v. Chater</u>, 67 F.3d 558, 567 (5th Cir. 1995)).

New evidence must be material to be the basis for a remand. The "materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied." <u>Castillo v. Barnhart</u>, 325 F.3d 550, 551-52 (5th Cir. 2003) (citing <u>Ripley</u>, 67 F.3d at 555); <u>accord</u> <u>Joubert</u>, 287 F. App'x at 383. This requirement means that the new evidence cannot merely concern a subsequently acquired

disability or the deterioration of a condition that was not previously disabling.  Id.; Garson, 162 F. App'x at 303.

In addition, "[f]or new evidence to be material, there must exist the reasonable possibility that it would have changed the outcome of the [Commissioner's] determination."  Hunter v. Astrue, 283 F. App'x 261, 262 (5th Cir. 2008) (quotations omitted) (citing Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981)); accord Jones v. Astrue, 228 F. App'x 403, 406 (5th Cir. 2008) (citing 28 U.S.C. § 405(g)).

The medical record submitted by Bullock is not material, as defined by the Fifth Circuit, for the following reasons.  First, the new evidence is dated June 10, 2011.  It therefore reflects the results of a test performed more than one year after the ALJ's opinion and almost two months after the Appeals Council denied review on April 19, 2011.  This report is immaterial because it does not relate to the period for which benefits were denied, which extended only from the alleged onset date of September 30, 2008 to April 23, 2010, the date of the ALJ's decision.  Joubert, 287 F. App'x at 383-84; Sanchez v. Barnhart, 75 F. App'x 268, 270 (5th Cir. 2003) (citing Shave v. Apfel, 238 F.3d 592, 597 (5th Cir. 2001)); Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994).  The report contains no "express retrospective medical opinion relating back to the [relevant] period" that addresses the onset date and any limitations caused by plaintiff's allegedly disabling

lumbar disk bulges.  <u>McLendon v. Barnhart</u>, 184 F. App'x 430, 432 (5th Cir. 2006) (citing <u>Likes v. Callahan</u>, 112 F.3d 189 (5th Cir. 1997); <u>Ivy v. Sullivan</u>, 898 F.2d 1045 (5th Cir. 1990)).  Thus, the new evidence, "when considered in light of the entire record, does not establish the existence of [plaintiff's] severe medical impairment as far back as [the alleged onset] date."  <u>Id.</u>

Second, plaintiff has failed to demonstrate a reasonable possibility that the test results would change the outcome of the Commissioner's decision.  Bullock asserts in her memorandum that the MRI results support her contention that she has chronic, disabling pain because of degenerative disk disease in her lumbar spine.  She also asserts that surgery (presumably on her back) is currently being scheduled.  Even if this new medical report contained a <u>diagnosis</u> of severe degenerative lumbar disk disease, which it does not, the mere diagnosis of an impairment "does not establish a claimant's disability claims."  <u>Martin v. Chater</u>, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing <u>Anderson v. Sullivan</u>, 925 F.2d 220, 222 (7th Cir. 1991)); <u>accord Harris v. Barnhart</u>, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); <u>Estok v. Apfel</u>, 152 F.3d 636, 640 (7th Cir. 1998); <u>Jones v. Sullivan</u>, 954 F.2d 125, 128 (3d Cir. 1991); <u>Arroyo v. Secretary of Health & Human Servs.</u>, 932 F.2d 82, 87-88 (1st Cir. 1991); <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir. 1983).  Plaintiff "must show that she was so <u>functionally impaired</u> by her [diagnosed impairment] that she was precluded

from engaging in any substantial gainful activity." Id. (emphasis added); accord Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992).

In this case, plaintiff's chronic pain symptoms and diagnoses of degenerative disk disease are reflected in the medical records dated before April 23, 2010, which the ALJ and the Appeals Council considered. Based on that evidence, the ALJ found that Bullock had severe impairments, consisting of chronic obstructive pulmonary disease and degenerative disc disease of the lumbar spine. To the extent that the new medical record documents pre-existing back disease, it is merely cumulative of the administrative record and there is no reasonable possibility that it would change the outcome of the Commissioner's decision. Lenoir v. Apfel, 234 F.3d 29, 2000 WL 1568184, at *1 (5th Cir. Sept. 14, 2000) (citing Haywood, 888 F.2d at 1471; Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989)); Perkins v. Shalala, No. 93-01940, 1994 WL 523788, at *3 (5th Cir. Sept. 12, 1994); Martin v. Barnhart, No. 02-3574, 2004 WL 1661207, at *3 (E.D. La. July 23, 2004) (citing Pierre, 884 F.2d at 803).

To the extent that plaintiff's new evidence might show any increased symptoms or newly diagnosed conditions that developed after April 23, 2010, the new medical record demonstrates at best a deterioration of a previously non-disabling condition. Multiple previous x-rays of Bullock's lumbar spine showed only mild degenerative changes at L4-L5 and L5-S1. (Tr. 275, 279, 309, 311, 319, 332, 335). Bullock told her

doctors on occasion that she had an MRI in 2005 or 2003, which had shown herniated disks and/or nerve impingement, although no such test results are in the record. (Tr. 181, 183, 230-31, 256, 302, 317, 326, 330). Even with her complaints of chronic pain and her diagnoses of degenerative disk disease, sciatica and lumbar radiculopathy, no medical record indicates that back surgery was ever contemplated or recommended by any physician before the ALJ rendered his decision. Therefore, no reasonable possibility exists that the new evidence would have affected the ALJ's determination that Bullock was not disabled before April 23, 2010. "Remand [cannot] be based on new evidence of a subsequent deterioration of what was previously correctly held to be a non-disability condition." Lenoir, 2000 WL 1568184, at *1; accord McLendon, 184 F. App'x at 432. If plaintiff has evidence that her condition has deteriorated to the point that she became disabled after April 23, 2010, she can use the evidence to apply directly to the Social Security Administration for benefits for the appropriate period. Shave, 238 F.3d at 597; Falco, 27 F.3d at 164 n.20.

Finally, Bullock has not demonstrated good cause for her failure to incorporate such evidence into the record at the administrative level. She has submitted no explanation, much less a "proper explanation," why she could not obtain and submit an additional evaluation, such as the June 10, 2011 report, to the ALJ before his decision. Pierre, 884 F.2d at 803. A medical examination conducted after the ALJ's decision

"alone is not sufficient to warrant a remand." Leggett, 67 F.3d at 567. Here, as in

Leggett, Bullock "does not provide a satisfactory explanation for" the absence of this

type of evidence "from the initial proceedings. The evidence consists of a new

examination taken far outside of the period in which [Bullock] applied for or was denied

benefits. [Bullock] offers no evidence that [her] current [physical] disability did not

subsequently develop after [her] initial application or that it is not the result of the

deterioration of a condition that was not previously disabling." Id. Thus, she fails in her

burden of providing good cause for the absence of this evidence and may not use it as the

basis for a remand.

Accordingly, Bullock's motion to submit new evidence is DENIED.

2.    The ALJ did not err in failing to take into account the side effects
      and limitations of plaintiff's medications and the frequency of her
      scheduled visits to her doctors and unscheduled visits to hospital
      emergency rooms.

The ALJ found at the fourth step of the sequential evaluation that Bullock had the

residual functional capacity to perform light work, except that she must avoid all

exposure to fumes, odors, dusts, gases and poor ventilation and concentrated exposure

to extreme cold and heat, wetness and humidity. The ALJ found that plaintiff's

medically determinable impairments could reasonably be expected to cause some of the

alleged symptoms, but that her statements concerning the intensity, persistence and

limiting effects of her symptoms were not credible to the extent they are inconsistent with that residual functional capacity assessment during the relevant time period. Bullock argues that the ALJ erroneously failed to take into account the side effects and limitations of her medications and the frequency of her scheduled visits to her doctors and unscheduled visits to hospital emergency rooms.

The residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." Perez, 415 F.3d at 461-62 (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985); accord Fontenot v. Astrue, No. 08-764, 2010 WL 1418591, at *2 (W.D. La. Mar. 18, 2010) (Hanna, M.J.), report & recommendation adopted, 2010 WL 1418658 (W.D. La. Apr. 7, 2010) (Melancon, J.); Cline v. Astrue, 577 F. Supp. 2d 835, 547-48 (N.D. Tex. 2008).

The ALJ stated several times that he had considered the entire record and the combined effects of Bullock's impairments. The ALJ's findings concerning plaintiff's residual functional capacity are substantially supported by the medical evidence, including the opinion of a consultative examiner, Felix G. Rabito, Sr., M.D. (Tr. 256-58), to which the ALJ assigned significant weight. (Tr. 16). The ALJ also accorded weight

to the opinion at the initial agency review level of the non-examining medical consultant, Charles Lee, M.D., who reviewed plaintiff's medical records and assigned her exertional limitations consistent with light work. (Tr. 281-89).

The record does <u>not</u> reflect that Bullock made such frequent trips to her doctors and to the emergency room that she cannot work. The record shows that, during the relevant time period of September 30, 2008 through April 23, 2010, plaintiff sought regular treatment for about a year from two physicians for a leg and foot injury she had suffered on June 18, 2008, when a sink in a motel fell off the wall and onto her foot. During those visits, she was also treated for back and hip pain.

Once her foot injury had largely resolved, Bullock sought treatment only sporadically at hospital emergency rooms when she had an exacerbation of pain as a result of a particular incident. Her last visit to any long-term treating physician was on April 8, 2009. She was next seen at a hospital emergency room on May 1, 2009, where she complained of a headache for the past four days and for which she received an injection of Toradol.[6] (Tr. 214-17). More than three months later, on August 4, 2009, plaintiff presented at the emergency room with low back pain after falling down, for

_____

[6]Toradol (generic name: ketorolac) is a nonsteroidal anti-inflammatory drug used for the short-term treatment of moderately severe pain. <u>PubMed Health</u> (Nat'l Ctr. for Biotech. Info., U.S. Nat'l Library of Medicine, Oct. 1, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000918.

which she received injections of Toradol and Dilaudid.[7]  (Tr. 272-80).  She did not see any health care provider for more than three months, until she was seen at the emergency room on November 27, 2009 with right elbow pain as a result of working in the yard the day before, for which she received an injection of Depo-Medrol.[8]  (Tr. 361-63).  Still another three months later, Bullock complained on February 27, 2010 of lower back pain after having pushed a lawn mower the previous day.  She received an injection of Demerol.  (Tr. 306-12).  She went back to the emergency room on March 2, 2010 for the same injury, complaining that Lortab, the oral pain medication that had been prescribed for her during her emergency room visit three days earlier, made her vomit.  She was given a new prescription for Percocet.[9]  (Tr. 298-303).

Similarly, the medical records do not substantially support plaintiff's allegation that the unspecified side effects of her medications prevent her from working.  The only

---

[7]Dilaudid (generic name: hydromorphone hydrochloride) is an opioid analgesic indicated for management of moderate to severe pain.  Physicians' Desk Reference 2507 (66th ed. 2012).

[8]Depo-Medrol (generic name: methylprednisolone acetate) is an anti-inflammatory glucocorticoid for intramuscular or soft tissue injection, "indicated as adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in acute gouty arthritis, acute and subacute bursitis, acute nonspecific tenosynovitis, epicondylitis, rheumatoid arthritis, synovitis of osteoarthritis." Drugs.com (Apr. 2010), http://www.drugs.com/pro/depo-medrol.html.

[9]Percocet is a combination of oxycodone hydrochloride, an opioid pain reliever, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone.  Percocet is used to relieve moderate to severe pain.  Drugs.com (Feb. 2, 2012), http://www.drugs.com/percocet.html.

medically documented instances of medication side effects are at the March 2, 2010

emergency room visit when Bullock complained that Lortab made her vomit and she was

given a different prescription, and on August 4, 2009 when she received Benadryl to

counteract itching caused by the injections of Toradol and Dilaudid during the same visit.

(Tr. 273). Neither of these instances supports an inference that plaintiff could not

function in a work setting because of medication side effects. In addition, she reported

in her disability reports filed with the Commissioner that she had not experienced side

effects from any medication (Tr. 120, 138), and she testified that Paxil does not knock

her out.

Accordingly, this assignment of error lacks merit.

### 3. The ALJ did not err by failing to adopt the hypothetical questions posed by plaintiff's attorney to the vocational expert.

Bullock argues that the ALJ's determination of her residual functional capacity

failed to take into account her frequent need to visit her doctors at scheduled times and

to go to the emergency room at unscheduled times, which allegedly preclude her from

maintaining gainful employment. She contends that, when her attorney added these

limitations to his hypothetical question to the vocational expert, Suggs testified that

plaintiff would be unable to perform any jobs. Bullock argues that the ALJ erred by

failing to adopt her attorney's hypothetical questions, which the ALJ found were not

expressed in vocational terms, did not provide clear or specific functional limitations, and were not supported in the record.  As discussed in the preceding section, the factual record does not substantially support plaintiff's argument that she frequently needs to visit her doctors at scheduled times and to go to the emergency room at unscheduled times.  Her argument that the ALJ should have accepted her counsel's hypothetical questions is also meritless.

The ALJ posed a hypothetical to Suggs that accounted for plaintiff's age, education, work experience and physical limitations, which the ALJ found to be credible. Because the hypothetical was limited to sedentary work, the vocational expert testified that such a claimant could not perform Bullock's past relevant work as a cashier or companion/sitter, which were both classified as light work.  However, Suggs testified that the hypothetical person could perform other sedentary jobs, such as cashier, information clerk, general office clerk and hand packer.

Although the ALJ's hypothetical included a limitation to sedentary work, he found in his opinion that Bullock <u>can</u> perform <u>light</u> work with the environmental limitations listed therein and therefore she can perform her past relevant work as a cashier and a companion/sitter for the elderly. Alternatively, considering her age, education, work experience and residual functional capacity, the ALJ held that Bullock is capable of performing other jobs that exist in significant numbers in the national economy, such as

cashier, information clerk, general office clerk and hand packer. The vocational expert's testimony supports these findings. Because the jobs that Suggs listed at the fifth step of the sequential evaluation are all sedentary jobs, a person who is capable of working at the light exertional level necessarily can work at the less strenuous sedentary level. See 20 C.F.R. § 416.967(b) ("If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors . . . ."). Thus, the ALJ's fifth step finding that Bullock can perform jobs that are available in the national economy is supported by the vocational expert's testimony.

Plaintiff's attorney also questioned Suggs at the hearing. An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); accord Vaught v. Astrue, 271 F. App'x 452, 456 (5th Cir. 2008); Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

In this case, plaintiff's counsel attempted to question Suggs. However, his questions were phrased in terms of the medical and testimonial evidence, not in terms of

plaintiff's functional limitations.  As Suggs stated during this questioning, she is not a medical expert and cannot render a medical opinion.  It is <u>not</u> a vocational expert's function to interpret the medical evidence in a Social Security disability proceeding to determine a claimant's residual functional capacity.  "During hearings, the responsibility for making this determination rests with the ALJ."  <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1023 (5th Cir. 1990) (citing 20 C.F.R. §§ 404.1545, 404.1546); <u>see also</u> <u>Falls v. Apfel</u>, No. 99-2785, 2000 WL 329233, at *7 (E.D. La. Mar. 29, 2000) (citing 20 C.F.R. § 404.1546; <u>Randall v. Sullivan</u>, 956 F.2d 105, 106 (5th Cir. 1992); <u>Owens v. Heckler</u>, 770 F.2d 1276, 1282 (5th Cir. 1985)) ("[I]t is the ALJ's duty, not the vocational expert's, to assess a claimant's [residual functional capacity].  The ALJ is not bound by [vocational expert] testimony which is based on evidentiary assumptions ultimately rejected by the ALJ."); <u>accord</u> <u>Vines v. Barnhart</u>, No. A-05-CA-763, 2006 WL 2822177, at *8 (W.D. Tex. Sept. 28, 2006).

Once the ALJ determines plaintiff's residual functional capacity, he may rely on vocational expert testimony to reach conclusions about the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.  20 C.F.R. § 404.1566(d), (e); <u>Villalpando v. Astrue</u>, 320 F. App'x 208, 211 (5th Cir. 2009); <u>Weary v. Astrue</u>, 288 F. App'x 961, 967 (5th Cir. 2008); <u>Leggett</u>, 67 F.3d at 565; <u>Vaughan v. Shalala</u>, 58 F.3d 129, 132 (5th Cir. 1995); <u>Villa</u>, 895 F.2d at 1022; Social Security Ruling 00-4P, 2000 WL 1898704 (Dec. 4, 2000).  That is what the ALJ did here.

The hypothetical questions of plaintiff's attorney generally failed to describe specific functional limitations. He was asked repeatedly by Suggs and the ALJ to include such limitations in his questions. When he was able to articulate some specific limitations in terms of frequency and duration to sustain particular abilities in the workplace, the extreme limitations that he posited were not substantially supported by the record. Therefore, the ALJ did not err by declining to adopt the questions or the vocational expert's responses that such a person would not be able to work. <u>Carey v. Apfel</u>, 230 F.3d 131, 143 (5th Cir. 2000).

CONCLUSION

The ALJ did not err in failing to take into account the side effects and limitations of plaintiff's medications and the frequency of her scheduled visits to her doctors and unscheduled visits to hospital emergency rooms because plaintiff's allegations concerning those limitations are not substantially supported by the record. For the same reason, the ALJ did not err in failing to adopt the hypothetical questions posed to the vocational expert by plaintiff's attorney.

**RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's Motion for Sentence Six in Lieu of Summary Judgment be DENIED and her complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[10]

New Orleans, Louisiana, this ___25th___ day of May, 2012.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[10]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.